

ORIGINAL

FILED IN CHAMBERS
U.S.D.C. - Atlanta

SEP 07 2022

Kevin P. Weimer, Clerk
By: Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal Information |
| *v.* | |
| NAGAINDRA SRIVASTAV | 1:22-CR-0304 |

THE UNITED STATES ATTORNEY CHARGES THAT:

**COUNT ONE**
**Conspiracy to Pay and Receive Kickbacks**
**(18 U.S.C. § 371)**

1. Beginning on a date unknown, but at least by in or about June 2020, and continuing until in or about October 2021, within the Northern District of Georgia, and elsewhere, the Defendant,

NAGAINDRA SRIVASTAV,

did knowingly and willfully combine, conspire, confederate, agree, and have a tacit understanding with Individual 1, Individual 2, Individual 3, Individual 4, Individual 5, and others known and unknown to the United States Attorney,

a. to commit an offense against the United States, that is, to knowingly and willfully solicit and receive remuneration (kickbacks and bribes), directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part

under a Federal health care program, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A); and

b. to commit an offense against the United States, that is, to knowingly and willfully offer and pay remuneration (kickbacks and bribes), directly and indirectly, overtly and covertly, in cash and in kind, to any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A).

**Background**

At all times relevant to this Information:

*The Medicare Program*

2. Medicare was a federal health care program that provided free or below-cost health care benefits to individuals who were sixty-five years of age or older or disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency the Center for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare.

3. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

4. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

5. Medicare was subdivided into multiple program "parts." Medicare Part A covered health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare Part B covered physician services and outpatient care, including an individual's access to DME, such as orthotic devices and wheelchairs.

*Durable Medical Equipment*

6. Orthotic devices were a type of DME that included rigid and semi-rigid devices, such as knee braces, back braces, shoulder braces, and wrist braces (collectively, "braces").

7. DME companies, physicians, and other health care providers that provided services to Medicare beneficiaries were referred to as Medicare "providers." To participate in Medicare, providers were required to submit an application in which the providers agreed to comply with all Medicare-related laws and regulations. If Medicare approved a provider's application, Medicare assigned the provider a Medicare "provider number." A health care provider with a Medicare provider number could file claims with Medicare to obtain reimbursement for services rendered to beneficiaries.

8. Enrolled Medicare providers agreed to abide by the policies, procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers were required to abide by the Anti-Kickback Statute and other laws and regulations. Providers were given access to Medicare manuals and services bulletins describing billing procedures, rules, and regulations.

9. Medicare reimbursed DME companies and other health care providers for services and items rendered to beneficiaries. To receive payment from Medicare, providers submitted and caused the submission of claims to Medicare, either directly or through a billing company.

10. A Medicare claim for DME reimbursement was required to set forth, among other things, the beneficiary's name and unique Medicare identification number, the equipment provided to the beneficiary, the date the equipment was provided, the cost of the equipment, and the name and unique physician identification number of the physician who prescribed or ordered the equipment.

11. A claim for DME submitted to Medicare qualified for reimbursement only if it was medically necessary for the treatment of the beneficiary's illness or injury and prescribed by a licensed physician.

*The Defendant and Related Entities*

12. Defendant NAGAINDRA SRIVASTAV was a resident of Boca Raton, Florida. Defendant SRIVASTAV owned and operated B2B Apps Solutions ("B2B"), among other related companies, located in Tampa, Florida. Defendant SRIVASTAV and Individual 1 were in the business of selling doctors' orders to DME companies, including Liberty Medical DME LLC ("Liberty") and Medihealth Medical Solutions LLC ("Medihealth"), as well as to resellers of doctors' orders.

13. Individual 1, a resident of Pelham, New York, was Defendant SRIVASTAV's business partner, who was in the business of selling doctors'

orders to DME companies, including Liberty and Medihealth, as well as to resellers of doctors' orders.

14. Individual 2 was a resident of Atlanta, Georgia, and was an owner and operator of Liberty, a Georgia corporation that did business in the Northern District of Georgia. Liberty was a DME company that purportedly provided braces to patients, including Medicare beneficiaries.

15. Individual 3 was a resident of Amory, Mississippi, and was an owner and operator of Liberty as well as Medihealth, a Mississippi company that did business in Amory, Mississippi. Medihealth was a DME company that purportedly provided braces to patients including Medicare beneficiaries.

16. Individual 4 was a resident of Boca Raton, Florida, and Individual 5 was a resident of Port St. Lucia, Florida. Individual 4 and Individual 5 were owners and operators of Laboratory Marketing Services LLC ("LMS"), also known as Senior Care, as well as 2020 Technology Holding, LLC and other related entities located in Boca Raton, Florida. Through these entities, Individual 4 and Individual 5 were in the business of selling patient information for Medicare beneficiaries for whom claims for DME could be billed as well as purchasing and selling doctors' orders. Individual 4 and Individual 5 purchased doctors' orders from Defendant SRIVASTAV.

## Purpose of the Conspiracy

17. It was a purpose of the conspiracy for Defendant SRIVASTAV and his co-conspirators to unlawfully enrich themselves by, among other things: (a) paying and receiving kickbacks and bribes in exchange for signed doctors' orders

for Medicare beneficiaries for braces that were medically unnecessary, not eligible for reimbursement, and/or not provided or authorized as represented; (b) submitting and causing the submission of false and fraudulent claims to Medicare; (c) concealing and causing the concealment of false and fraudulent claims; and (d) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

## Manner and Means of the Conspiracy

18. The manner and means by which Defendant SRIVASTAV and his co-conspirators sought to accomplish the objects and purposes of the conspiracy included, among other things, the following:

19. Defendant SRIVASTAV, along with his co-conspirators, including Individual 1, created and operated an internet-based platform that individuals and businesses in the health care industry used for the purchase and sale of physician orders for DME, such as ankle, back, knee, and leg braces. Through B2B and other related companies, Defendant SRIVASTAV and Individual 1 paid and received remuneration for the referral of federal health care business.

20. To accomplish this, Defendant SRIVASTAV created a website, RepsHub, in which DME companies and other health care "representatives" uploaded potential DME-patient information, called "leads," which were generally obtained through telemarketing campaigns targeting beneficiaries for whom DME products could be billed.

21. In addition, and in conjunction with his selling of physician orders, Defendant SRIVASTAV also offered and sold leads, which he obtained through call centers controlled by himself and his co-conspirator, Individual 1.

22. For DME companies or other customers who did not purchase leads from Defendant SRIVASTAV, the "lead" information would be uploaded to B2B through RepsHub. Upon receipt of the leads, Defendant SRIVASTAV sent the lead information to purported telemedicine companies, who would return signed physicians' orders for those patients in exchange for payment. Defendant SRIVASTAV sold those orders to DME customers for approximately $100 per physician's order.

23. For customers who purchased both leads and physicians' orders, Defendant SRIVASTAV and his co-conspirators supplied the customer with signed physician orders for billable beneficiaries upon receipt of payment of approximately $325 per lead with its associated order(s).

24. Defendant SRIVASTAV, Individual 1, and their co-conspirators used two Canadian corporations as part of the scheme, which provided no services to any customers. But Defendant SRIVASTAV and Individual 1 caused their customers to enter into contracts with these Canadian corporations, including MDS Health ("MDS") and Innovation Tech Lab ("Innovation Tech"), called "Management Services Agreements," which falsely stated that the companies would provide management and administrative services for the Defendant's customers. Neither Defendant SRIVASTAV, Individual 1, nor B2B were named in these contracts. Defendant SRIVASTAV, Individual 1, and their co-

conspirators received kickback payments from their customers for doctors' orders through bank accounts associated with the Canadian corporations, and the Defendant also paid kickbacks to purported telemedicine providers through these accounts

25. Among their numerous other clients, Defendant SRIVASTAV and Individual 1 sold doctors' orders to Individual 2 and Individual 3, who owned and operated Liberty, located in the Northern District of Georgia. Defendant SRIVASTAV and Individual 1 also sold doctors' orders to Individual 4 and Individual 5, who owned and operated LMS.

26. Defendant SRIVASTAV was notified on multiple occasions that the purported authorizing physicians had not signed the doctors' orders that Defendant SRIVASTAV and Individual 1 sold to their clients.

**Overt Acts**

27. In furtherance of the conspiracy, and to accomplish its objects and purposes, Defendant SRIVASTAV and his co-conspirators committed and caused to be committed the following overt acts, among others, in the Northern District of Georgia and elsewhere:

28. On or about June 3, 2020, Individual 3 executed a "Management Services Agreement" with one of the Canadian corporations used by Defendant SRIVASTAV and Individual 1 to receive kickback payments, but which provided no services itself. The Management Services Agreement falsely stated that the Canadian corporation would provide management and administrative services when, in reality, Defendant SRIVASTAV and Individual 1, who were not named

in the contract, provided only signed doctors' orders for DME to Individual 2 and Individual 3, who owned and operated Medihealth and Liberty, in return for kickbacks.

29. On or about July 30, 2020, Individual 2 and Individual 3, through Liberty, transferred $2,500 to Defendant SRIVASTAV and Individual 2, through MDS Health, in exchange for signed doctors' orders for DME to be billed by Liberty.

30. On or about August 3, 2020, Defendant SRIVASTAV, Individual 2, and their co-conspirators caused signed doctors' orders to be provided to Liberty via Dropbox in exchange for the July 30, 2020 payment.

31. Between on or about August 3, 2020 and August 5, 2020, Individual 2 and Individual 3 caused Liberty to submit claims to Medicare based upon the orders purchased from Defendant SRIVASTAV and Individual 2.

32. On or about November 2, 2020, Individual 3, through Medihealth, transferred $15,000 to Defendant SRIVASAV and Individual 2, through Innovation Tech, in exchange for signed doctors' orders for DME to be billed by both Liberty and Medihealth.

33. On or about November 3, 2020, Defendant SRIVASTAV, Individual 2, and their co-conspirators caused signed doctors' orders to be provided to Liberty and Medihealth via Dropbox in exchange for the November 2, 2020 payment.

34. Between on or about November 3, 2020 and November 9, 2020, Individual 2 and Individual 3 caused Liberty and Medihealth to submit claims to

Medicare based upon the orders purchased from Defendant SRIVASTAV and Individual 2.

All in violation of Title 18, United States Code, Section 371.

**COUNT TWO**
**Solicitation or Receipt of Kickbacks**
**(42 U.S.C. § 1320a-7b)**

35. Paragraphs 2 through 26 of this Information are re-alleged and incorporated by reference as if fully set forth herein.

36. On or about July 30, 2020, in the Northern District of Georgia and elsewhere, the Defendant,

NAGAINDRA SRIVASTAV,

did knowingly and willfully solicit and receive remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, namely, a wire transfer in the approximate amount of $2,500 from the originating Bank of America account ending in 3578 belonging to Liberty to a Bank of Montreal bank account ending in 0263, belonging to MDS Health, a Canadian company used by Defendant SRIVASTAV and Individual 1, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, namely, Medicare.

All in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A) and Title 18, United States Code, Section 2.

**Forfeiture**

Pursuant to Title 18, United States Code, Section 982(a)(7), upon conviction of any offenses alleged in Counts One through Two above, the Defendant, NAGAINDRA SRIVASTAV, shall forfeit to the United States any property constituting, or derived from, any proceeds obtained, directly or indirectly, from gross proceeds traceable to the commission of the offense.

RYAN K. BUCHANAN
*United States Attorney*

DAVID A. O'NEAL
*Assistant United States Attorney*
Georgia Bar No. 342071
david.oneal@usdoj.gov

600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
(404) 581-6000; Fax: (404) 581-6181